NO. 07-01-0491-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



JANUARY 28, 2003



______________________________




ORLANDO ROBERT WELLS AKA 


ORLANDO ROBERT WELK, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;



NO. 43,924-E; HONORABLE WELDON KIRK, JUDGE



_______________________________



Before JOHNSON, C.J., REAVIS, J., and BOYD, S.J. (1)

MEMORANDUM OPINION
 

 Presenting two issues for our determination, appellant Orlando Robert Wells aka
Orlando Robert Welk challenges his conviction after a guilty plea for the offense of
burglary of a building, enhanced because of two prior convictions, and the resulting court-assessed punishment of 20 years confinement in the Institutional Division of the
Department of Criminal Justice. There was no plea bargained recommendation as to
punishment. In his issues, he queries: 1) whether his guilty plea was voluntarily given,
and 2) whether the trial court erred in accepting his plea because evidence was produced
regarding his innocence. We affirm the trial court judgment.

 Appellant argues his two issues together, and we will likewise discuss them
together. The indictment alleged that appellant did "with intent to commit theft,
intentionally and knowingly enter a building and a portion of a building not then open to
the public, without the effective consent of Daryl Gene Wright, the owner thereof." In
entering his guilty plea, appellant waived his right to a jury, acknowledged in writing
receiving the usual admonishments, and in writing, judicially confessed to the offense
charged. In open court, he pled guilty to the charge against him and pled true to the
enhancement paragraphs. In response to questions by the careful trial judge, he
represented that he was not entering the plea as a result of any threat or promise, but
because he had in fact committed the offense. After receiving these representations, the
trial court accepted appellant's plea.

 Appellant points to certain statements he made during the hearing which, he says,
support the issue of his innocence. In particular, those statements are:

* * *

 Q: . . . And this time - Mr. Wright, how do you think he felt when his
business was broken into?


 A: He probably felt like I felt. He probably wouldn't feel - I don't remember
- to the best of my knowledge and - and I've been under oath. I don't
remember taking anything. I've went over this - I don't know if my other
counsel or my other counsel here spoke to you about it. I didn't break in that
garage. I was in that garage.

 

 Q: And items from the garage were found in your pocket. Correct?


 A: They said some stickers, yes, sir.


 Q: That's not your property. Right?


 A: That's right.


 Q: Mr. Wells, if the victim of that crime, Mr. Wright, was here, what do you
think he would expect? A man who's been convicted three times before for
burglary breaks into his business, what does he have a right to expect?


 A: What he would expect? He would expect - I don't know. It's kind of like
I felt when that guy run [sic] over my dad and killed him.


 Q: You weren't happy, were you? You wanted justice, didn't you?


 A: But it was an accident. And if I - if I could speak to Mr. Wright today, I
would sit him and tell him, I did not pry open your door and break into your
garage.


* * *


 Additionally, after the court had found appellant guilty, the following colloquy
took place:

 THE COURT: Do you have any legal reason why sentence should not be
pronounced? Do you have anything to say?


 The DEFENDANT: Well, I - I'd like to say - I'd like to - you know, the -
they've tried to go over it with them and tell them what happened on this, that
I didn't break into that building.


 THE COURT: Anything further to say?


 THE DEFENDANT: I'm not guilty of breaking in that building. The witness
that said - they said that seen me was a totally different person than me.


 THE COURT: You entered a plea of guilty and confessed your guilt and now
you're saying you're not guilty?


 THE DEFENDANT: I was guilty of being there - of the burglary, but I wasn't
guilty of prying open the doors. A witness had said - from the Toot-N-Totum that the person was not me.

* * *

Then, after appellant's sentence was announced, he made the following statement to the
court:

 THE DEFENDANT: You know, in this case I have come forth to try to work
with the State on what - who the person was. I've made to the officer that
- the description of the guy that was there. I was at the - I didn't break in
that building. The person - indictment, which is increasing the punishment
on me, like I mentioned, was a trailer house that I was living in and I refused
to pay the landlord with some marijuana. He put a hasp on the door. I went
back in to get my belongings. I was living at that residence. I spent a total
of eight days in TDC and was discharged on that whole sentence after I
completed the five years' probation on that crime, which is being used
against enhancement punishment.


 On the other one, I was a passenger in a vehicle. The indictment would read
- we can get the police reports on it. I was made an offer of four years, and
I would be right home is why I took that four years. The party that done the
burglary admitted to the burglary. And I feel at this time that the punishment
of what's been assessed to me is fairly excessive to what crime - of the
magnitude that this really is of.


 Citing all of the above, appellant argues that the evidence of his innocence was
raised prior to the close of the evidence. He then reasons that a plea is involuntary and
should be withdrawn "whenever the evidence fairly raises an issue as to the defendant's
innocence."

Even though appellant never sought to withdraw his guilty plea, he argues that the above
testimony and statements are sufficient to show that his plea was involuntary.

 Even though not all of the testimony relied upon by appellant was offered prior to
the time the court found him guilty, for the purpose of our discussion, we will assume that
it was sufficient to raise a question of his innocence prior to the close of evidence. When
a guilty plea is entered in a felony case being tried before a jury and never withdrawn, and
evidence is introduced which reasonably and fairly raises an issue as to the defendant's
innocence and is not withdrawn, the trial court sua sponte must withdraw the guilty plea
and enter a not guilty plea. Griffin v. State, 703 S.W.2d 193, 195 (Tex. Crim. App. 1986);
Hinkle v. State, 934 S.W.2d 146, 148 (Tex. App.--San Antonio 1996, pet. ref'd). 

 However, in Moon v. State, 572 S.W.2d 681 (Tex. Crim. App. 1978), the court held
that requirement no longer applied to instances in which the plea was made before the
court itself. In doing so, the court stated:

 There now seems to be no valid reason for the court to withdraw the guilty
plea and enter a plea of not guilty for the defendant when the defendant
enters a plea of guilty before the court after waiving a jury. It is the duty of
the trial court to consider the evidence submitted and as the trier of the facts
the court may find the appellant guilty of a lesser offense and assess the
appropriate punishment or it may find the defendant not guilty. It would
serve no purpose to withdraw the plea of guilty and enter a not guilty plea.
Those cases in which the court has reached a different result are overruled
to the extent they conflict with the opinion in this case.


Id. at 682 (quoting Burks v. State, 165 S.W.2d 460 (Tex. Crim. App. 1942)).


 The Moon rule appears to continue in force. See, e.g., Beasley v. State, 634
S.W.2d 320, 321 n.1 (Tex. Crim. App. 1982); Brown v. State, 11 S.W.3d 360, 362-63 (Tex.
App.--Houston [1st Dist.] 2000, pet. ref'd); Solis v. State, 945 S.W.2d 300, 302-03 (Tex.
App.--Houston [1st Dist.] 1997, pet. ref'd); Hinkle v. State, 934 S.W.2d 146, 148-49 (Tex.
App.--San Antonio 1996, pet. ref'd); Graves v. State, 803 S.W.2d 342, 346 (Tex. App.--Houston [14th Dist.] 1990, pet. ref'd).

 Although Moon does not apply in cases in which the defendant presents a motion
to withdraw the plea, Coronado v. State, 25 S.W.3d 806, 809 (Tex. App.--Waco 2000, pet.
ref'd), or in cases where the voluntariness of a plea is questioned for some reason other
than evidence raised as to the defendant's innocence, Owens v. State, 836 S.W.2d 341,
344 (Tex. App.--Fort Worth 1992, no pet.), neither of those situations is presented here.

 Additionally, appellant's testimony only raises an issue whether he "pried" open the
door or "broke" into the building. To commit the offense of burglary of a building, one need
only enter a building not then open to the public with intent to commit a felony, theft, or an
assault. Tex. Pen. Code Ann. § 30.02(a)(1) (Vernon Supp. 2003). Therefore, it was not
necessary for appellant to break into or pry open a door. It was sufficient if he entered by
walking through an open door without the owner's consent. See Johnson v. State, 664
S.W.2d 420, 422 (Tex. App.--Amarillo 1983, pet. ref'd, untimely filed).

 In support of his argument, appellant cites and relies upon Payne v. State, 790
S.W.2d 649 (Tex. Crim. App. 1990). However, the facts before the Payne court are
different from those here. In Payne, the defendant had pled guilty to aggravated robbery,
but at the hearing averred that the gun used was a toy one, testimony previously unknown
to his lawyer. His attorney then sought to withdraw the plea, but the trial court refused to
let him do so. In an unpublished opinion, the court of appeals held that the trial court
should have let the defendant withdraw his plea, but found the error was harmless. The
Court of Criminal Appeals disagreed with that analysis and held the error could not be
harmless because the testimony raised a significant issue as to the defendant's guilt of
aggravated robbery by undermining the factual basis of his signed confession and that
testimony raised an issue as to the voluntariness of his confession. Id. at 652. In the case
before us, appellant never sought to withdraw his plea which, in light of Moon and its
progeny, is a significant difference. 

 Appellant also relies upon Burke v. State, 80 S.W.3d 82 (Tex. App.--Fort Worth
2000, no pet.). That appeal resulted from a guilty plea before a jury. After he had been
found guilty, the appellant and his lawyer filed a motion seeking a new trial. As relevant
here, in the motions, they averred that they had not understood that the State had to
actually prove reckless conduct in order to establish guilt. The Burke court held that the
defendant's plea was not voluntarily and knowingly entered because the defendant would
not have pled guilty if he had been properly advised of the requisite mental culpability that
must have been proved by the State. Id. at 94. However, that case is distinguishable
because it not only involved a plea before the jury, but also because it involved testimony
produced at a hearing on the motion for new trial.

 In this case, being a bench trial, the trial court did not reversibly err in not sua
sponte withdrawing the guilty plea. We further hold that the trial court was entitled to
determine the guilt or innocence of appellant under the testimony produced. The portions
of testimony upon which appellant relies were only part of the evidence and, when
considered with the other evidence in the case, including appellant's admission that he
was present in the building in question, was sufficient to sustain the trial court's guilt
finding.

 Appellant's issues are overruled and the judgment of the trial court is affirmed. 


 John T. Boyd

 Senior Justice


Do not publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 2003). 



thern Railway Company (KCS), alleging
on-the-job injuries. The suit was settled before trial, but during preparation
of the settlement documents the parties disagreed over whether KCS was entitled
to set off $8177.81 in benefits paid Nussbeck under a Supplemental Sickness
Benefits Plan. After a hearing on that issue, the trial court entered judgment
in accordance with the settlement and denying KCS the setoff. The appeal thus
presents the single issue whether the trial court erred in denying KCS its
requested setoff. We will affirm the trial court.

The facts are not in dispute. Nussbeck was a carman
foreman for KCS and a member of the American Railway and Airway Supervisor
Association (ARASA). In 1997, ARASA negotiated a new compensation agreement for
its members with KCS. Among other provisions, the agreement made the
supervisors represented by ARASA eligible to participate in an existing benefit
plan established by KCS and other railroads for their railroad shop craft
employees under a 1979 agreement, the Supplemental Sickness Benefit Agreement.
The benefit plan was implemented through an insurance policy issued by
Provident Life and Accident Insurance Company, and was further described in a
Supplemental Sickness Benefit Plan Document and a Plan Summary.  

Under the 1979 agreement with craft employees, KCS
and the other railroad employers paid the premiums for their employees= participation in the
Supplemental Sickness Benefit Plan. The 1997 agreement between ARASA and KCS
provided, though, that the supervisors would pay the premium for their
participation in the plan through monthly payroll deduction.[1]









Applicable federal law, Section 5 of FELA, 45 U.S.C.
' 55, renders void any
contract by which a common carrier exempts itself from liability under the Act,
but provides that, in any action brought against a carrier under the Act, the
carrier may set off against amounts for which it may be liable sums the carrier
has contributed or paid to insurance or similar benefits paid to the injured
employee on account of the injury.

Citing cases in which employers were allowed setoff,
under 45 U.S.C. ' 55, of payments made to
plaintiff-employees under benefit plans created by the employer, KCS contends
that case law applying 45 U.S.C. ' 55 to plans like the Supplemental Sickness Benefit
Plan mandates the conclusion that it is entitled to set off Nussbeck=s benefits against its
FELA liability to him. Nussbeck responds that his payment of the premium cost
for his coverage under the plan distinguishes this case from those cited by KCS
and requires that the benefits be ignored in calculating his recovery against
his employer, under the general rule applicable to compensation received from a
collateral source. Nussbeck cites Gypsum Carrier, Inc. v. Handelsman,
307 F.2d 525 (9th Cir. 1962), a Jones Act case which treated a
state-created unemployment disability fund, supported primarily by employee
contributions and to which the employer had made no contribution, as a
collateral source. Id. at 535. 








There is a third category of cases, in which the
courts have found that benefits funded with payments made by the employer were
nonetheless to be treated as from independent, collateral sources, and thus not
subject to setoff, because the court concluded that the benefits were part of
the employee=s compensation.[2]
See Hall v. Minnesota Transfer Ry. Co., 322 F.Supp. 92, 96
(D.Minn.1971); Southern Pac. Transp. Co. v. Allen, 525 S.W.2d 300, 306
(Tex.Civ.App.--Houston [14th Dist.] 1975, no writ). 








As noted, the Supplemental Sickness Benefit Plan was
established by the railroads pursuant to a collective bargaining agreement. The
plan does not bear the earmarks of those 45 U.S.C. ' 55 was designed to
prohibit. See Folkestad  v.
Burlington N., Inc., 813 F.2d 1377, 1379-80 (9th Cir. 1987)
(noting the legislative history of 45 U.S.C. ' 55 indicates it was enacted to bar devices used by
railroads to exempt themselves from full liability for employee injuries).
Further, although benefits are payable without regard to fault or the employer=s liability,[3]
the terms of the plan evidence the railroads= intent that benefits paid under the plan be
credited against any obligation the employer owes under FELA with respect to
the injury and not give rise to double liability.[4]  We conclude, though, that Nussbeck=s payment of premiums
disentitles KCS to set off the benefits he received against its FELA liability
to him, even under the cases cited by KCS. 








KCS relies on Clark v. Burlington N., Inc.,
726 F.2d 448 (8th Cir. 1984); Folkestad, 813 F.2d 1377; and Burlington
N. R.R. Co. v. Strong, 907 F.2d 707 (7th Cir. 1990). KCS urges
that this appeal should be governed by the holdings of those cases that the
source of premiums is not the determinative factor in deciding whether benefits
should be regarded as emanating from the employer or from a collateral source,
and that courts instead focus on the purpose and nature of the fund and the benefit
payments.[5]  Since the nature of this benefit plan is
such as to permit setoff,[6]
and the language of the plan expressly provides for setoff,[7]
KCS contends, it is entitled to setoff. But the contention takes the holdings
of those cases out of their contexts. Although, as noted, each opinion
concludes that setoff of the benefits in question was appropriate, none of them
reasonably can be read to say that 45 U.S.C. ' 55 permits an employer to set off benefits for
which it has not paid.

The Folkestad court=s discussion of the issue
clearly is premised on the requirement that to be eligible for setoff, benefits
must be paid for by the employer. There the court referred to Gypsum Carrier,
in which, as noted, the same circuit held that benefits a seaman received from
a state disability fund supported primarily by employee contributions[8]
would not reduce his Jones Act recovery against his employer, and stated, AThus if employee
contributions pay for the insurance, benefits are regarded as collateral to the
employer and setoff is prohibited.@ Folkestad, 813 F.2d at 1380. 

The Clark opinion is similarly premised,
stating:

A problem arises in
distinguishing a fringe benefit from a benefit meant to indemnify an employer
against future liability. A benefit may be exempt from setoff under the
collateral source rule even though the employer is the sole source of the fund.
The important consideration is the character of the benefits received, rather
than whether the source is actually independent of the employer. 

 

726
F.2d at 450.

 








In Strong, the employee plaintiff was covered
by a 1973 version of the Supplemental Sickness Benefit Agreement. The agreement
contained language identical to that in the 1979 agreement at issue here.[9]
Strong argued that the benefit payments were intended as a fringe benefit of
his employment and not subject to setoff. 907 F.2d at 713. The court noted that
Burlington paid the entire cost of funding the benefit program and pointed to
the plan language indicating the railroad=s intent that payments made under the plan not
duplicate amounts received for loss of wages from the employer. Id. at
714. The court relied on the Clark and Folkestad opinions in
rejecting Strong=s contention that setoff
of the benefits would violate 45 U.S.C. ' 55, and holding that setoff was appropriate. Id.
at 713-14. The Strong opinion must be seen as founded on the fact
Burlington paid for the coverage.

KCS refers also to the statement in the Fifth
Circuit opinion in Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th
Cir. 1972), that the mere fact an employer has contributed to the fund from
which an employee receives benefits does not necessarily mean that the fund is
not a collateral source. KCS posits that the opposite must also be true, and
that the mere contribution by employees to the fund from which benefits derive
does not establish the benefits as a collateral source. KCS cites no authority
for its assertion, which seems to us generally contrary to the language of 45
U.S.C. ' 55 and cases applying it.
See, e.g., Folkestad, 813 F.2d at 1380.








KCS also points out that the Benefit Plan is Aoverwhelmingly funded@ by the employer, and
asserts that Nussbeck=s premium for participation in the plan was lower because
of the large size of the insured group, a factor that KCS sees as a subsidy to
Nussbeck and other ARASA members. Such an unquantified benefit to Nussbeck does
not render the payments made to him sums contributed or paid by his employer,
for purposes of 45 U.S.C. ' 55.     

Concluding that the trial court did not err in
denying KCS setoff of amounts paid Nussbeck under the Supplemental Sickness
Benefit Plan, we overrule appellant=s issue and affirm the trial court=s judgment. 

 

James
T. Campbell

        Justice

 

 

 

 

 

 

 

 

 

 











[1]The relevant language from
the 1997 ARASA agreement with KCS reads as follows:

 

ARTICLE VI - PROVIDENT INSURANCE

 

Effective January 1, 1997,
the Carrier [KCS] will place employees [ARASA members] within the Provident
Life and Accident Insurance Company Policy No. R-5000 Supplemental Sickness
Benefit Plan for railroad shop craft employees (hereinafter AProvident@) under the conditions
specified hereinafter:

 

(1)              
Provident is an
insurance policy and, as such, the stipulations therein are subject to change;
therefore, employees covered by Provident are subject to the conditions set
forth in its policy (and subsequent revision [sic] thereto).

(2)              
The monthly
premium (cost per employee) will be paid by each employee through payroll
deduction in the first period of each month.





[2]This Afringe benefit@ argument can thus be seen
simply as another way of stating that the benefit has been paid for by the
employee. Cf. Hall, 322 F.Supp. at 96.





[3]See Hall, 322 F.Supp. at 96-97,
distinguishing insurance coverage obtained by an employer and limited to
injuries on the job for which the employer might be liable. 





[4]The courts have construed
45 U.S.C. ' 55 to recognize employers= legitimate interests in
avoiding double liability for the same injury. See Folkestad, 813
F.2d at 1380; Clark v. Burlington N., Inc., 726 F.2d 448, 451 (8th Cir.
1984).
KCS does not
directly argue that disallowance of setoff causes it double liability to
Nussbeck.





[5]Clark, 726 F.2d at 450-51; Folkestad,
813 F.2d at 1381; Strong, 907 F.2d at 713.





[6]Indeed, as KCS points out, Strong
dealt with an earlier version of the same benefit plan involved here, but
with respect to a claimant for whom his employer paid the premiums. 907 F.2d at
714. 





[7]The Plan Summary contains
the following language: Aif benefits are paid under this Plan, the benefit
payments will be deducted from any payment for loss of wages in any case in
which the employer or a third party is liable for the injury.@

 

Nussbeck
contends that the plan language providing for setoff does not apply to
supervisors because there is no language in KCS=s 1997 collective bargaining agreement with ARASA comparable to language in
the 1979 agreement. KCS points out that the Plan Summary is expressly made a
part of the plan under the terms of the Plan Document, and the Summary restates
the employer=s right of setoff clearly.
For purposes of this opinion, we accept KCS=s position that the terms of the plan expressly made
applicable to ARASA members include the provision for setoff of benefits
against any liability of KCS for lost wages under FELA.





[8]The court quoted from Gypsum
Carrier: AThe tortfeasor should not
be required to compensate twice for the same injury, but he should not have the
benefit of payments to the injured person which he did not make.@ Folkestad, 813 F.2d
at 1380, quoting Gypsum Carrier, 307 F.2d at 534.





[9]The 1979 Supplemental
Sickness Benefit Agreement contained a paragraph stating that the parties did
not intend benefits under the plan to duplicate any amount recovered for loss
of wages, but instead intended that benefits under the plan would satisfy any
right of recovery for loss of wages against the employing railroad to the
extent of benefits paid and would be offset against any such right of recovery.
The corresponding paragraph from the 1973 agreement is quoted in Strong,
907 F.2d at 709.